Toby BOYD, Plaintiff,

v.

HOMES OF LEGEND, INC., Defendant.

Daniel R. FOSTER, Sharon Foster,
and Myrtle Speaks, Plaintiffs,

v.

HOMES OF LEGEND, INC.;
et al., Defendants.

Kenneth M. BASS, Plaintiff,

v.

HOMES OF LEGEND, INC., Defendant.

Civil Action Nos. 97–T–142–E,
97–T–152–N, 97–T–161–N.

United States District Court,
M.D. Alabama,
Eastern and Northern Division.

Oct. 1, 1997.

G. Houston Howard, II, Howard, Dunn, Howard & Howard, Wetumpka, AL, for plaintiffs.

Algert S. Agricola, Jr., Wallace, Jordan, Ratliff & Brandt, L.L.C., Montgomery, AL, Charles B. Campbell, David L. Selby, II, Wallace, Jordan, Ratliff & Brandt, L.L.C., Birmingham, AL, for defendant.

## MEMORANDUM OPINION AND ORDER

MYRON H. THOMPSON, Chief Judge.

These three lawsuits present three primary issues. The first is whether a manufacturer, who is a nonsignatory to contracts executed by purchasers and their dealers, may invoke arbitration clauses contained in those contracts to compel arbitration of the purchasers' claims pursuant to the Federal Arbitration Act, as amended, 9 U.S.C.A. §§ 1–16, commonly known as the FAA. The second is whether the arbitration clause in one of the contracts was secured by fraud and is therefore unenforceable by the dealer. The third, more novel, issue presents a question that was left unaddressed, and thus unresolved, in this court's recent decision in *Wilson v. Waverlee Homes, Inc.*, 954 F.Supp. 1530 (M.D.Ala.1997), *aff'd*, 127 F.3d 40 (11th Cir. September 18, 1997) (table). In *Waverlee Homes*, this court held that the Magnuson–Moss Warranty–Trade Commission Improvement Act, 15 U.S.C.A. §§ 2301–2312, severely restricts the right of manufacturers to compel consumers to arbitrate their claims of breach of *written* warranties. Here, the related and unanswered question is whether the Magnuson–Moss Act similarly restricts the right of dealers to compel arbitration of consumer claims for breach of implied or statutory warranties, that is, *non-written* warranties.

In these actions, five plaintiffs have brought claims alleging breach of implied and express warranties, various theories sounding in tort, as well as violation of the Magnuson–Moss Act, against defendant Homes of Legend, a manufacturer of mobile homes. These claims stem from the five plaintiffs' purchases of mobile homes manufactured by Homes of Legend. Two of the five plaintiffs, Toby Boyd and Kenneth M.

Bass, originally filed their lawsuits in the Circuit Court of Elmore County, Alabama. The dealers who sold the mobile homes to Boyd and Bass are not parties to these two suits. The three remaining plaintiffs, Daniel R. Foster, Sharon Foster, and Myrtle Speaks (collectively, the Foster plaintiffs), originally filed the third lawsuit addressed in this opinion in the Circuit Court of Lee County, Alabama. In addition to Homes of Legend, they named as defendants the dealer Hart's Mobile Home Sales, Inc., and its owners Jimmy and Judy Hart (collectively, the Hart defendants). With one exception, the Foster plaintiffs assert the same claims against both Homes of Legend and the Hart defendants: This one exception is that the Foster plaintiffs' warranty claims against Homes of Legend are based on both written and non-written warranties, whereas their claims against the Hart defendants are based on only non-written warranties. In addition, the Foster plaintiffs alleged further breach-of-non-written-warranty, tort, and Magnuson–Moss Act claims against the Hart defendants.

Homes of Legend and the Hart defendants removed all three lawsuits from state to federal court on the basis of this federal court's concurrent federal-question jurisdiction under 28 U.S.C.A. §§ 1331 and 1441(a), the Magnuson–Moss Act, 15 U.S.C.A. § 2310(d), and this court's discretionary supplemental jurisdiction over related state-law claims upon removal. 28 U.S.C.A. § 1441(c).

Pending before the court are (1) motions by Homes of Legend to dismiss all claims against it, or, in the alternative, to compel binding arbitration under the FAA and to stay judicial proceedings pending the outcome of arbitration; and (2) a motion by the Hart defendants to dismiss the claims against them and to compel arbitration. For the following reasons, Homes of Legend's motions will be denied, and the Hart defendants' motion will be granted.

## I. BACKGROUND

In June 1995, the Foster plaintiffs purchased from the Hart defendants a mobile home manufactured by Homes of Legend.[1]

---

1. Because they could not secure the necessary financing on their own, the Fosters asked

Speaks, the mother of Mrs. Foster, to purchase the home in their name. It was Speaks, there-

In February 1996, Bass purchased a mobile home from the Hart defendants that had also been manufactured by Homes of Legend. That same month, Boyd purchased a Homes of Legend mobile home from Stuttson, Inc. All three purchases were made pursuant to retail installment contract and security agreements—that is, purchase contracts—containing clauses for binding arbitration of disputes.[2] In each case, the only party signatories to the purchase contracts were the purchaser-plaintiffs, the retailer and a third-party financing institution. Homes of Legend was not a party to any of these agreements.

In their complaints, all five plaintiffs allege that Homes of Legend provided them with express written warranties that it would remedy defects in materials or workmanship in the mobile homes for one year. Additionally, all five plaintiffs allege that a myriad of state and federal consumer warranties protect their homes, including implied and non-written warranties of merchantability, habitability, and freedom from substantial defect. The five plaintiffs contend that all three homes suffer from a large number of serious manufacturing defects, enumerated in detail in the complaints, which have allegedly per-

sisted despite Homes of Legend's repair efforts. All five plaintiffs also allege that Homes of Legend's conduct regarding the mobile homes violates consumer-protective provisions of the Magnuson–Moss Act. In addition to these breach-of-warranty claims, all five plaintiffs allege that Homes of Legend fraudulently induced them to purchase defective homes by concealing material facts from them, and all plaintiffs include in their complaints allegations of wanton construction and wanton or negligent repair against Homes of Legend.

The Foster plaintiffs' complaint, in contrast to those of Boyd and Bass, names as defendants both Homes of Legend and the Hart defendants, and, with the exception mentioned above, includes the same claims brought by Boyd and Bass as well as other claims based on breach of non-written warranty, tort, and the Magnuson–Moss Act against the Hart defendants. Specifically, the Foster plaintiffs allege that the Hart defendants committed fraud by concealing the existence of the arbitration clause in the contract governing the mobile home purchase, and accuse the Hart defendants of fraudulent concealment and misrepresentations regarding the condition of the home

---

fore, who signed the Foster plaintiffs' purchase contract, which was to be transferred to Mr. Foster's name after one year, provided the monthly payments were maintained.

**2.** In the purchase contract entered into by Bass, the Hart defendants and a financing institution, and in the contract entered into by the Foster plaintiffs, the Hart defendants and the same financing institution, the arbitration clause reads in pertinent part as follows:

"ARBITRATION: All disputes, claims or controversies arising from or relating to this Contract or the parties thereto shall be resolved by binding arbitration by one arbitrator selected by you with my consent.... Judgment upon the award rendered may be entered in any court having jurisdiction. The parties agree and understand that they choose arbitration instead of litigation to resolve disputes.... The parties agree and understand that all disputes arising under the case law, statutory law and all other laws, including, but not limited to, all contract, tort and property disputes will be subject to binding arbitration in accord with this Contract. The parties agree that the arbitrator shall have all powers provided by law, the Contract and the agreement of the parties. These powers shall include all legal and equita-

ble remedies including, but not limited to, money damages, declaratory relief and injunctive relief...."

The purchase contract entered into by Boyd, Stuttson, Inc. and a third-party financing institution contains an arbitration clause reading in pertinent part as follows:

"Dispute Resolution. Any controversy or claim between or among you and I or our assignees arising out of or relating to this contract or any agreements or instruments relating to or delivered in connection with this contract, including any claim based on or arising from an alleged tort, shall, if requested by either you or me, be determined by arbitration, reference, or trial by a judge as provided below. A controversy involving only a single claimant, or claimants who are related or asserting claims arising from a single transaction, shall be determined by arbitration as described below.... The award of the arbitrator(s) shall be in writing and include a statement of reasons for the award. The award shall be final. Judgment upon the award may be entered in any court having jurisdiction, and no challenge to entry of judgment upon the award shall be entertained except as provided by Section 10 of the United States Arbitration Act or upon a finding of manifest injustice."

and the Hart defendants' ability to repair it.[3] The Foster plaintiffs' complaint, however, like those of Boyd and Bass, is devoid of any allegation that Homes of Legend and the Hart defendants acted together in a prearranged, collusive scheme to defraud them.

In the pending motions, Homes of Legend and the Hart defendants seek dismissal of all claims on the ground that the binding arbitration clauses found in the purchase contracts mandate that all of the plaintiffs' claims be adjudicated in binding arbitration governed by the FAA. In the alternative, Homes of Legend asks the court to stay judicial proceedings in these cases and compel arbitration pursuant to § 3 of the FAA. Because it is not persuaded by any of Homes of Legend's arguments regarding the claims against it, as explained more fully below, this court declines to dismiss or stay the proceedings on these claims. However, the court will grant the Hart defendants' motion with respect to the claims raised against them.

## II. DISCUSSION

The outcome of the defendants' motions hinges, as stated earlier, on the resolution of three primary issues. These three issues, in an order slightly different from that given earlier, are as follows: First, this court must determine whether there exist any grounds, in law or in equity, which permit the warrantor Homes of Legend, a nonsignatory to the purchase contracts containing the arbitration clauses, to invoke the FAA and so seek to compel arbitration of the plaintiffs' claims against it.[4] Second, the court must decide the novel question of whether the Magnuson–Moss Act prohibits the Hart defendants, who have not provided the Foster plaintiffs with a written warranty, but who are signatories to the purchase contracts containing the arbitration clauses, from compelling arbitration of the warranty-based claims raised against them by the Foster plaintiffs. And, third, the court must resolve whether the arbitration clause in one of the contracts was secured by fraud and is therefore unenforceable by the dealer.

### A. Homes of Legend's Right to Compel Arbitration of the Plaintiffs' Claims

#### i.

The facts of the cases addressed in this opinion are strikingly similar to those presented in *Waverlee Homes*, which was recently decided by this court. In *Waverlee Homes*, the plaintiffs were disgruntled purchasers of mobile homes pursuant to retail installment and security contracts containing binding arbitration clauses. As in the cases at bar, the *Waverlee Homes* plaintiffs sought relief from the mobile home manufacturer, which was not a signatory to the purchase contracts. Despite its nonsignatory status, the mobile home manufacturer in *Waverlee Homes* moved to compel arbitration of the plaintiffs' claims on the basis of the arbitration clauses in the purchase contracts. This court rejected the manufacturer's arguments proffered in support of its right to compel arbitration, for reasons that are equally applicable to the cases at bar, as explained more fully below.

■ As noted in *Waverlee Homes*, "the 'primary purpose' of the FAA is to ensure 'that private agreements to arbitrate are enforced according to their terms [and] arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their agreements as they see fit.'" 954 F.Supp. at 1533 (quoting *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford, Jr. Univ.*, 489 U.S. 468, 479, 109 S.Ct. 1248, 1255–56, 103 L.Ed.2d 488 (1989)). It is a cardinal principle of federal arbitration law that "'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648, 106 S.Ct. 1415,

---

3. The complaint also includes allegations of transportation damage against two fictitious parties.

4. The Hart defendants, named in the Foster plaintiffs' complaint, are signatories to the underlying purchase contracts. Consequently, the arbitrability of the Foster plaintiffs' claims against the Hart defendants turns not on the whether a nonsignatory has the right to invoke the arbitration clause in that agreement against a signatory, but rather on the enforceability of the clause in light of the Magnuson–Moss Act and the Foster plaintiffs' allegations of fraud regarding its procurement. These issues are considered later.

1418, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers v. Warrior & Gulf Navig. Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960)). Thus, as was true in *Waverlee Homes*, here the defendant manufacturer Homes of Legend must establish that, despite the absence of any explicit mention of Homes of Legend in the purchase contracts signed by the plaintiffs and their dealers, the plaintiffs nonetheless constructively, or as a matter of law, agreed to submit to arbitration the tort, breach-of-warranty, and Magnuson–Moss Act claims they now level against Homes of Legend.

█ It is the court's task, unless the parties have explicitly agreed otherwise, to determine whether an agreement to arbitrate exists between parties. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942–47, 115 S.Ct. 1920, 1923–25, 131 L.Ed.2d 985 (1995). In making this determination, the court should apply ordinary state common law governing the formation of contracts, with due regard for the federal policy favoring arbitration. *Volt Info. Sciences*, 489 U.S. at 475–76, 109 S.Ct. at 1254; *see also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62–63 & n. 9, 115 S.Ct. 1212, 1219 & n. 9, 131 L.Ed.2d 76 (1995). However, only state laws that are applicable to contracts generally may be applied to arbitration agreements; a state law that singles out arbitration agreements for disfavored treatment is displaced by the FAA. *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 618, ——, 116 S.Ct. 1652, 1655–56, 134 L.Ed.2d 902 (1996); *see also Allied–Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 281, 115 S.Ct. 834, 843, 130 L.Ed.2d 753 (1995) (states may regulate contracts, including arbitration clauses, under general contract law principles, but may not single out arbitration clauses for disfavor); *First Options of Chicago*, 514 U.S. at 944, 115 S.Ct. at 1924 (state law generally governs the determination of whether the parties agreed to arbitrate a certain matter).

█ It is almost axiomatic, as a first rule of state common law governing the formulation of contracts, that parties must manifest assent to a bargain in order to be bound under it. *See* Restatement (Second) of Con-

tracts § 17. Hence, state law generally parallels the Supreme Court's observation in *AT & T Technologies* that " 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' " 475 U.S. at 648, 106 S.Ct. at 1418 (quoting *Warrior & Gulf Navig. Co.*, 363 U.S. at 582, 80 S.Ct. at 1353). *See also Old Republic Ins. Co. v. Lanier*, 644 So.2d 1258, 1260 (Ala. 1994). Beyond that, also as a general matter, one "who is not a party to a contract has no standing to compel arbitration." *Britton v. Co-op. Banking Group*, 4 F.3d 742, 744 (9th Cir.1993); *Ex Parte Stallings & Sons, Inc.*, 670 So.2d 861, 862 (Ala.1995). But there are important exceptions to these general propositions and statements.

█ One such exception arises when the parties to a contract together agree, upon formation of their agreement, to confer certain benefits thereunder upon a third party, affording that third party rights of action against them under the contract. *See Barber v. Business Products Center, Inc.*, 677 So.2d 223, 227 (Ala.1996). However, the party claiming to be a third-party beneficiary of a contract bears the burden of establishing that the contracting parties intended to bestow a benefit upon it. *Weathers Auto Glass, Inc. v. Alfa Mut. Ins. Co.*, 619 So.2d 1328 (Ala.1993).

█ The evidence before the court establishes that Homes of Legend has not satisfied this burden. As noted above, no reference to Homes of Legend may be found in any of the purchase contracts between plaintiffs and their mobile home dealers. Instead, the relevant language from the arbitration clauses in the contracts entered into by Bass and the Foster plaintiffs with their dealers reads: "All disputes, claims or controversies arising from or relating to this Contract or the parties thereto shall be resolved by binding arbitration...."[5] Employing a slightly different formula, the contract between Boyd and his mobile home dealer provides: "Any controversy or claim between or among you and I or our assignees arising out of or relating to this contract or any agreements or instruments relating to or

---

5. *See supra* note 2.

delivered in connection with this contract, including any claim based on or arising from an alleged tort, shall, if requested by either you or me, be determined by arbitration...." [6] Despite the absence of any specific reference to Homes of Legend in these arbitration clauses and despite its nonsignatory status, Homes of Legend insists that the breadth of the language reflects the signatories' intent to encompass within the arbitration clauses the plaintiffs' breach-of-warranty, tort, and Magnuson–Moss Act claims against Homes of Legend.

Struggling to find support for third-party beneficiary status under the purchase contracts, Homes of Legend points to the alleged breadth of the language "relating to ... the parties" in the arbitration clauses in the contracts entered into by Bass and the Foster plaintiffs. According to Homes of Legend, the references in the complaints to the dealers from whom these plaintiffs purchased their mobile homes are sufficient to establish that these plaintiffs' claims against Homes of Legend "relate to the parties" of the purchase contracts and hence fall within the purview of the arbitration clauses.

However, as the plaintiffs correctly point out, Homes of Legend hopes to don the mantle of a third-party beneficiary on the basis of language that is in all relevant respects identical to that analyzed by this court in *Waverlee Homes*. Consideration of the analogous language in the Woodall contract at issue in *Waverlee Homes* led this court to conclude that "[n]o stretch of the imagination would be adequate to encompass the concept that the parties ... contemplated disputes with non-parties related to stated and implied warranties." *Waverlee Homes*, 954 F.Supp. at 1534. The court declines to reach a contrary conclusion here. The reference to disputes "relating to ... the parties thereto" must be limited to those disputes having their genesis in the purchase contracts that involve the actual signatories to the contracts. As the plaintiffs assert, "the parties" must be interpreted to refer exclusively to the contract signatories, and consequently the arbitration provision must be read to encompass only disputes between or among the signatories, and to exclude claims, such

as those involved here and in *Waverlee Homes*, that pit a single signatory against an unnamed, nonsignatory third party. The conclusion Homes of Legend urges the court to reach would impermissibly thrust upon the arbitration clauses a meaning that was not intended by the signatories to the agreements.

Although the arbitration clause in the Boyd contract does contain somewhat different language from that in the two contracts just discussed, there is nothing in the Boyd contract to dissuade the court from reaching the same conclusion. That contract provides for arbitration of controversies or claims "arising out of or relating to ... any agreements or instruments relating to or delivered in connection with this contract." Homes of Legend asserts that its written warranty is an example of a collateral "agreement[ ] or instrument[ ]" contemplated by this language. This wishful interpretation misses the point, however. The critical question is not whether the warranty constitutes the sort of *document* referred to in the arbitration clause, but whether Homes of Legend is a *party* contemplated by the signatories when they agreed to that clause. The only reasonable interpretation of the Boyd arbitration clause is that, while it may purport to encompass disputes stemming from documents collateral to the Boyd contract, it is restricted to such disputes occurring between or among the signatories, and not those between a single signatory and an unnamed nonsignatory. This conclusion is confirmed by the opening language of the Boyd arbitration provision, which expressly limits its purview to disputes "between or among" the signatories. Moreover, the Boyd arbitration clause language is identical in all important respects to that contained in the Wilson contract considered in *Waverlee Homes*, which this court interpreted to exclude unnamed third parties. 954 F.Supp. at 1534. Thus, the court finds that the Boyd arbitration clause, like those in the contracts executed by Bass and the Foster plaintiffs, does not vest Homes of Legend with third-party beneficiary status such that it may invoke arbitration.

---

**6.** *Id.*

Homes of Legend's reliance on *Ex parte Gates,* 675 So.2d 371 (Ala.1996), to establish that the contracting parties in these three cases granted Homes of Legend third-party standing to invoke arbitration, is misplaced. While it does appear that in *Gates* the Alabama Supreme Court found that a defendant mobile home manufacturer could compel arbitration against a purchaser on the basis of an arbitration clause to which the manufacturer was not a signatory, that court subsequently has explained that its holding was not based upon an interpretation of the underlying arbitration clause. *See Ex parte Isbell,* No. CV–95–8362, 1997 WL 531100, at *3–*4, *12 (Ala. August 29, 1997).[7] In *Isbell,* which also involved a mobile home purchase contract having an arbitration provision, the court clarified that *Gates* may not be relied upon to establish that a nonsignatory could compel arbitration based upon the contract executed by the buyers and retailer of the mobile home, because this issue was not actually considered by the court in *Gates,* having never been raised at the trial court. *Id.* at *3–*4.

The *Isbell* court went on to interpret the arbitration clause at issue in that case, finding that it was insufficiently broad to encompass the claims against the nonsignatory manufacturer. This arbitration clause, on its face, was significantly broader than those found in the three purchase contracts at issue here. It purported to encompass "[a]ll disputes, claims or controversies arising from or relating to this Contract *or the relationships which result from this contract.*" *Id.* at *12 (emphasis added). Nonetheless, despite this apparently expansive language, the Alabama Supreme Court concluded that the arbitration provision did not extend to claims against unnamed third parties. In support of its holding, the court pointed out that another provision of the contract specified that the arbitration clause was meant to apply exclusively to the buyers, the retailer and the financing institution involved in the sale, all of whom signed the purchase contract. *Id.* This express limitation of the scope of the arbitration agreement led the court to conclude that the *Isbell* agreement was meant to

exclude unnamed third parties, and was restricted to disputes arising between or among the signatories of the contract. *See also Ex parte Martin,* No. CV–96–46, 1996 WL 650307, at *3, —— F.Supp. ——, —— (Ala. Nov. 8, 1996) (arbitration agreement, lacking broad reference to "relationships which result from this contract," found to be expressly limited to contract signatories).

Thus, the Alabama Supreme Court's decision in *Isbell* reinforces the conclusion that Homes of Legend is not a third-party beneficiary to the arbitration clauses in the purchase contracts at issue here. Like the arbitration clause considered in *Isbell,* those found in the Bass, Foster plaintiffs, and Boyd contracts are expressly and unambiguously limited to the contract signatories.

Nor do the written warranties provided by Homes of Legend to the plaintiffs establish that the plaintiffs agreed to vest Homes of Legend with authority to compel arbitration of the plaintiffs' claims. As was true in *Waverlee Homes,* here the manufacturer's warranties are devoid of any arbitration provision, nor do they seek to incorporate by reference the arbitration provisions in the purchase contracts between the plaintiffs and dealers.

Thus, like the defendant mobile home manufacturer in *Waverlee Homes,* Homes of Legend has failed to convince the court that the plaintiffs ever agreed to waive their rights regarding their claims against Home of Legend, nor did they assent to extend to Homes of Legend third-party rights to compel arbitration pursuant to the mobile home purchase contracts.

ii.

 Having concluded that the signatories bestowed no third-party rights upon Homes of Legend, the court must next determine the possible applicability of the other exceptions to the general proposition that a nonparty has no standing to compel arbitration. As this court noted in *Waverlee Homes,* a nonparty seeking to compel a party to arbitrate "must first, as a threshold, estab-

---

7. This opinion was withdrawn and replaced with minimal changes on October 31, 1997. *See* 1997 WL 679418.

lish grounds, in law or equity, why it should be permitted to assert rights under a contract to which it is NOT a party." 954 F.Supp. at 1535. One such ground arises when, under agency or related principles, the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided. *See, e.g., J.J. Ryan & Sons v. Rhone Poulenc Textile. S.A.,* 863 F.2d 315, 320–21 (4th Cir.1988) (charges against parent company based on same facts as claim against subsidiary, with whom arbitration agreement is in effect, may be referred to arbitration also); *Arnold v. Arnold Corp.,* 920 F.2d 1269, 1281 (6th Cir.1990) (nonsignatory defendant, as agent of signatory defendant, may compel arbitration). As was true in *Waverlee Homes,* however, there is no basis here to conclude that an agency relationship exists between the mobile home manufacturer and the dealers. Moreover, like the warranty in *Waverlee Homes,* the warranty provided by Homes of Legend to the plaintiffs specifically disavows such a relationship, and there is no corporate identity between Homes of Legend and the dealers. 954 F.Supp. at 1535.

▆ The doctrine of equitable estoppel provides another ground for permitting a nonsignatory to compel arbitration against a signatory. *See, e.g., McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co.,* 741 F.2d 342, (11th Cir.1984) (nonsignatory defendant could compel arbitration under theory of equitable estoppel where claims against it were intimately founded in and intertwined with underlying contract obligations); *Sam Reisfeld & Son Import Company v. S.A. Eteco,* 530 F.2d 679, 681 (5th Cir.1976) (nonsignatory defendants could stay judicial proceedings where charges against [signatory and nonsignatory] defendants were based on the same operative facts and were inherently inseparable); *Staples v. The Money Tree, Inc.,* 936 F.Supp. 856, 859 (M.D.Ala.1996) (nonsignatory defendants could compel arbitration because signatory plaintiff's claims were founded in and intertwined with underlying contract obligations); *Roberson v. The Money Tree of Alabama, Inc.,* 954 F.Supp. 1519, 1529 (M.D.Ala.1997) (same holding).

*McBro* is a paradigmatic example of a case where equitable estoppel properly applies. There, a manager and a contractor each had a contract with a hospital to work on a construction project. Both contracts contained arbitration clauses. A dispute broke out between the contractor and the manager, who had no contract between them. The court ruled that the dispute had to be arbitrated because the duties the contractor claimed were breached by the manager were duties that arose under the contractor's contract with the hospital. The assignment of duties under that contract was the basis for the lawsuit; thus the other conditions of the contract applicable to disputes, including the arbitration clause, had also to be given effect. The claim at issue could not be adjudicated without interpreting and possibly enforcing the terms of that contract. The Eleventh Circuit stated that the dispute between the parties to the litigation was "intimately founded in and intertwined with the underlying contract obligations." *McBro,* 741 F.2d at 344 (quoting *Hughes Masonry Co. v. Greater Clark County School Bldg. Corp.,* 659 F.2d 836, 841 n. 9 (7th Cir.1981)). The factual setting in *Hughes* was almost identical to that in *McBro.*

▆ Undaunted by the defendant manufacturer's failure in *Waverlee Homes* to persuade this court to compel arbitration under the doctrine of equitable estoppel as applied in *McBro,* Homes of Legend urges the court to revisit that case and reach a different conclusion here. The court declines to do so, however, because despite Homes of Legend's protestations to the contrary, it occupies a position with respect to equitable estoppel that is virtually indistinguishable from that occupied by the defendant manufacturer in *Waverlee Homes.*

▆ *McBro* and the other equitable estoppel cases cited above establish that unless at least one of two factual scenarios is present, courts are loathe to find that the claims against a nonsignatory are intimately founded in and intertwined with the underlying contractual obligations such that the doctrine of equitable estoppel may be applied. Under the first scenario, exemplified by *McBro,* the duties and responsibilities alleged to have

been breached by the nonsignatory must have arisen under and have been assigned to the nonsignatory by the contract containing the arbitration provision. *See, e.g., Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.,* 10 F.3d 753, 757–58 (11th Cir.1993), *cert. denied* 513 U.S. 869, 115 S.Ct. 190, 130 L.Ed.2d 123 (1994) (*McBro* and *Hughes* "rest on the foundation that ultimately, each party must rely on the terms of the written agreement in asserting their claims."); *Thomson–CSF,* 64 F.3d at 779 (equitable estoppel not applicable because the alleged violation did not arise out of or integrally relate to the contract); *Goodwin v. Ford Motor Credit Co.,* 970 F.Supp. 1007, 1017 (M.D.Ala.1997) (equitable estoppel applied where the plaintiffs' claims arose from "duties bound up with the terms and conditions" of the underlying contract). Under the circumstances of these cases, adjudication of the disputes between the signatory and nonsignatory parties would require interpretation, and probably enforcement, of the specific terms and conditions of the underlying contract.

The second factual setting in which application of equitable estoppel is warranted arises when the signatory raises allegations of, not merely parallel or similar, but substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. Recently, this court has had occasion to apply equitable estoppel and compel arbitration under such circumstances in two cases, *Staples v. The Money Tree, Inc.,* 936 F.Supp. 856 (M.D.Ala.1996) and *Roberson v. The Money Tree of Alabama, Inc.,* 954 F.Supp. 1519 (M.D.Ala.1997). In *Staples,* the plaintiff sued a financial lender and two insurers of the loan collateral for jointly and fraudulently inducing her to incur needless insurance charges. Only the lender, and not the insurers, was a signatory party to the loan agreement upon which the plaintiff based her claims. That loan agreement contained the arbitration clause the defendants sought to invoke. Similarly, in *Roberson* the plaintiffs accused a financial lender and two nonsignatory insurance companies of scheming together to saddle them with unnecessary and expensive insurance. In both instances, this court applied the doctrine of equitable estoppel, concluding that the plaintiffs' allegations

of such pre-arranged, collusive behavior established that their claims against the insurers were intimately founded in and intertwined with the obligations imposed by the underlying loan agreements. *See Staples,* 936 F.Supp. at 859; *Roberson,* 954 F.Supp. at 1529. In *Staples,* this court emphasized that the plaintiff's "claims against the [the insurers were] derivative of, and predicated on, her claims against [the lender]; if she had no claim against [the lender], she had no claim against [the insurers]." 936 F.Supp. at 859. In *Roberson,* this court emphasized that the holding was a result of the plaintiffs' allegations of "common breaches of duties by all defendants working hand-in-hand," essentially acting on behalf of each other to commit a common and conspiratorial fraud. 954 F.Supp. at 1522, 1529.

The facts of the cases at issue here do not support application of the doctrine of equitable estoppel under either scenario described above. Homes of Legend attempts to plant these cases firmly within the terrain staked out by the first scenario, arguing that the plaintiffs' claims implicate it and the signatories inseparably, and that the purchase contracts were responsible for creating the duties and responsibilities, as well as the warrantor-warrantee relationship, that breathe life into the plaintiffs' claims against Homes of Legend. However, as in *Waverlee Homes,* here the plaintiffs' warranty claims "are not intertwined with and founded upon the sales installment agreements, except in the utterly collateral sense that if the plaintiffs had never purchased their mobile homes, they would not have been protected by the warranties that came with them." 954 F.Supp. at 1536. Unlike in the cases cited above applying equitable estoppel under the first scenario, here the court need not even read, let alone interpret or possibly enforce, the specific terms and conditions of the purchase contracts to fully adjudicate the plaintiffs' claims against Homes of Legend. Plainly, the plaintiffs do not seek to bind Homes of Legend to the terms of the purchase contracts while simultaneously denying that the arbitration clauses within those contracts compel them to submit their claims to arbitration. *See id.* As a result, it would be wholly inappropriate to apply equitable estoppel in this context.

Moreover, this analysis is unaffected by the fact that one set of plaintiffs, the Foster plaintiffs, have chosen to sue the Hart defendants in addition to Homes of Legend. As this court noted in *Waverlee Homes,*

"It is not enough that the defendant and the third party have common and parallel duties toward the plaintiff, and so could both be sued on the same theory of tort. Thus, it is not determinative that the plaintiffs here could have chosen to sue Hart's Mobile Home on some of the liability theories raised in their complaints, but did not. What matters is that none of the duties the plaintiffs are claiming that Waverlee breached arose under and were assigned to it by the sales agreements between the plaintiffs and Hart's Mobile Home, which are the sole agreements governed by an arbitration clause here."

954 F.Supp. at 1536; *see also Roberson,* 954 F.Supp. at 1529. So long as the plaintiffs' complaints are devoid of any allegations that Homes of Legend breached any duties or responsibilities stemming from the purchase contracts, but rather state claims that are based upon independent warranty agreements or other duties, it is immaterial to this analysis whether the plaintiffs chose to sue anyone in addition to Homes of Legend based upon those contracts.

Nor do the plaintiffs' allegations of fraud against Homes of Legend draw these cases under the rubric of the second scenario discussed above. Although all three complaints allege that Homes of Legend fraudulently concealed and misrepresented material facts regarding the mobile homes, and the Foster plaintiffs' complaint incorporates similar claims of fraud against the Hart defendants, the complaints are notably devoid of any allegations that Homes of Legend and the mobile home dealers acted in concert to defraud the plaintiffs. The court agrees with Homes of Legend that some of the claims raised by the Foster plaintiffs against the Hart defendants are virtually identical to and based upon similar conduct as those raised against Homes of Legend. Importantly,

however, the Foster plaintiffs merely allege similar, not joint, conduct. Nor do they advance the theory that the Hart defendants acted as Homes of Legend's front in committing the alleged frauds. Thus, unlike in *Roberson* and *Staples,* the Foster plaintiffs have opted to pursue parallel claims of fraudulent conduct against two separate commercial entities who have common, but decidedly distinct, duties toward them, without alleging that they cooperated in a fraudulent scheme. Under these circumstances, the court concludes that none of the plaintiffs' claims against Homes of Legend are inextricably bound up with the terms and duties of the contracts the plaintiffs have signed with their dealers.

Accordingly, the court refuses to apply the doctrine of equitable estoppel to compel the plaintiffs to arbitrate any of their claims against Homes of Legend. Thus, because the court finds no basis in law or equity to permit the nonsignatory Homes of Legend to compel arbitration of the plaintiffs' claims, Homes of Legend's motion will be denied as to all claims asserted against it.

**B. The Hart Defendants' Right to Compel Arbitration under the Magnuson–Moss Act and General Contract Law Principles**

Because the court has concluded that none of the claims against Homes of Legend is subject to arbitration, the sole remaining issue is whether the Hart defendants may compel the Foster plaintiffs to arbitrate any of their breach-of-warranty, tort, or Magnuson–Moss Act claims. Because the Hart defendants, unlike Homes of Legend, have entered into a contract with the Foster plaintiffs that includes an explicit agreement to arbitrate claims relating to the mobile home purchase, it would appear at first blush that the Hart defendants have a clear right to compel arbitration. However, resolution of this issue is not so straightforward, but requires the court first to determine the enforceability of the arbitration clause at issue, in light of both the Magnuson–Moss Act and general principles of contract law.[8]

---

8. Because the court has already ruled on the basis of contract law and equity principles that the nonsignatory Homes of Legend may not enforce the arbitration clauses against any of the plaintiffs, there is no need to reach the question

of whether the Magnuson–Moss Act renders the clauses unenforceable by Homes of Legend. Nonetheless, the court sees no reason why its holding in *Waverlee Homes,* that under the Act

i.

In *Waverlee Homes*, the court summarily introduced the Magnuson–Moss Act as follows: "In 1974, Congress enacted the Magnuson–Moss Act 'In order to improve the adequacy of information available to consumers, [and] prevent deception.' 15 U.S.C.A. § 2302(a). It sets out clear and comprehensive requirements regarding disclosures, duties, and remedies associated with warranties on consumer products. Products covered by the Act include any 'tangible personal property which is distributed in commerce and which is normally used for personal, family or household purposes.' § 2301(1)." 954 F.Supp. at 1537.

The Foster plaintiffs urge the court to extend its holding in *Waverlee Homes* to the facts here and find that the Magnuson–Moss Act renders the arbitration clause in the Foster plaintiffs' purchase contract unenforceable by the Hart defendants. The parties correctly observe that they ask the court to decide the question that was not presented in *Waverlee Homes*, where only the nonsignatory manufacturer's right to enforce a *binding* arbitration clause in a purchase contract was at issue, and the parties made no attempt to draw a distinction between the treatment of *written* and *non-written* warranties under the Magnuson–Moss Act; that is, the court must decide here whether the dealer, who is a signatory to the purchase contract and who has not provided the Foster plaintiffs with any written warranty, may enforce an arbitration clause under the Magnuson–Moss Act. To do so, the court must determine whether the Act's consumer-protective provisions override the FAA's mandate that arbitration clauses in contracts generally be enforced. As explained below, the court holds that its decision in *Waverlee Homes* should not be extended to the situation presented here, involving only *non-written* warranties, and thus that the Magnuson–Moss Act does not preclude the Hart defen-

dants from compelling *binding* arbitration of the Foster plaintiffs' breach-of-warranty claims against the Hart defendants pursuant to the FAA.[9]

■■■ As a threshold matter, this court notes that the FAA renders enforceable pre-dispute arbitration agreements in contracts involving interstate commerce, preempting state statutory law. *See Allied–Bruce Terminix*, 513 U.S. at 280–82, 115 S.Ct. at 843; *see also Hurst v. Tony Moore Imports, Inc.*, 699 So.2d 1249, 1251 (Ala.1997). Thus, if the Magnuson–Moss Act is not found to preclude arbitration pursuant to the FAA, the Foster plaintiffs will be required to submit their claims against the Hart defendants to binding arbitration, provided the arbitration clause otherwise is enforceable under general contract law principles.

■■■ The defendants correctly point to the analytical framework articulated by the Supreme Court in *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), for determining when the provisions of a federal statute such as the Magnuson–Moss Act can be understood to prohibit binding arbitration pursuant to the FAA. Under *McMahon*, the general mandate of the FAA that agreements to arbitrate statutory claims must be enforced may be overridden by a statute evincing a contrary congressional command. 482 U.S. at 226, 107 S.Ct. at 2337. "The burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue." *Id.* at 227, 107 S.Ct. at 2337. Such an intent will, according to the Court, be deducible from the text or legislative history of the statute, or from the observation of an inherent conflict between FAA-governed arbitration and the statute's underlying purposes. *Id.* Thus, under *McMahon*, the Foster plaintiffs must demonstrate that Congress intended to make an

---

such arbitration clauses may not be enforced by a manufacturer who offers a written warranty to the purchaser, should not apply to Homes of Legend. 954 F.Supp. at 1537–40.

**9.** It is important to note that the court is not now confronted with a claim where a consumer seeks to pursue *both* written and non-written warranty

claims against a warrantor. Therefore, the court need not address the interesting question of whether the Magnuson–Moss Act would restrict binding arbitration of the non-written warranty claim as well, in particular if it were closely related to, or intertwined with, the written warranty claim. Although this issue could have been raised in *Waverlee Homes*, it was not.

exception to the FAA's mandate for claims arising under the Magnuson–Moss Act.

Not surprisingly, the parties disagree about whether the Foster plaintiffs have satisfied this burden. The Hart defendants, predictably, read nothing in the Magnuson–Moss Act or its legislative history to suggest that it reflects a congressional intent to preclude binding arbitration of warranty disputes covered by the Act, while the Foster plaintiffs rely heavily on this court's decision in *Waverlee Homes* to urge the opposite conclusion.

This dispute centers on the text of the Magnuson–Moss Act, its legislative history, the regulations promulgated by the Federal Trade Commission to enforce the Act's provisions, and their history, all of which this court considered in detail in *Waverlee Homes*. Before delving once again into these materials, the court wishes to reiterate the precise rationale for its holding concerning the Magnuson–Moss Act in *Waverlee Homes*, and to highlight the characteristics of the case at bar that distinguish it from the circumstances presented in *Waverlee Homes*.

In *Waverlee Homes*, the defendant manufacturer had provided the purchaser-plaintiffs with a written product warranty. That written warranty contained no arbitration clause. Nonetheless, the manufacturer sought to compel arbitration of the breach-of-warranty claims brought by the plaintiffs. This court refused to compel arbitration under those circumstances, noting that the manufacturer, who under the Magnuson–Moss Act was forbidden to include a binding arbitration clause in its written warranty, impermissibly sought to "piggyback" on an arbitration clause in the purchase contract between the dealer and purchaser, and so achieve "by surrogate or vicarious means what it is forbidden to do on its own behalf." 954 F.Supp. 1530. Allowing the manufacturer to succeed in this ploy, this court noted, would result in "the complete and utter evisceration of the Magnuson–Moss Act." *Id.*

Because the defendant in *Waverlee Homes* had provided the plaintiffs with a *written* warranty, as that term is defined in the Magnuson–Moss Act, it was appropriate for this court to pay particular attention to the provisions of the Act that set forth rules governing the scope and nature of *written* warranties. Thus, the court focused on the form that "informal dispute settlement mechanisms or procedures" established by written warrantors may take, and emphasized that such mechanisms or procedures must be *non-binding* and may not function as a bar to relief in court. *See* 954 F.Supp. at 1537. Additionally, in mining the legislative history of the Act, as well as the implementing regulations and their history, for statements that revealed Congress's intent regarding the permissibility of binding arbitration as a means to adjudicate breach of warranty claims, this court's focus was again on statements made regarding written warranties. *See id.* at 1537–39. Accordingly, the conclusion in *Waverlee Homes* that Congress intended in the Magnuson–Moss Act to preclude *binding* arbitration of warranty claims must be understood to be limited to *written* warranties, which are the subject of highly detailed and specific provisions of the Act.

■ Here, however, the Hart defendants are not written warrantors under the Magnuson–Moss Act, having provided no written warranty to the Foster plaintiffs. Consequently, they are not subject to the numerous provisions of the Act aimed exclusively at written warranties, including those governing the establishment of informal dispute procedures, which were shown in *Waverlee Homes* to be the source of the clearest expressions of congressional intent to preclude binding arbitration in certain circumstances.

The Hart defendants are, however, "warrantors" under the Act, which defines such a person as "any supplier or other person ... who is or may be obligated under an implied warranty," 15 U.S.C.A. § 2301(5), and defines an implied warranty as one "arising under State law (as modified by ... this title) in connection with the sale by a supplier of a consumer product." 15 U.S.C.A. § 2301(7).[10] Thus, the Hart defendants are subject to those provisions of the Act that address warranties in general, and implied warranties in particular, but not those specif-

---

**10.** Under the Alabama Commercial Code, the Hart defendants may be subject to implied war-
ranties on the basis of their sale of the mobile home. *See* 1975 Ala.Code §§ 7–2–314, –315.

ically directed to written warranties. Accordingly, here the court may not simply rely upon its analysis in *Waverlee Homes*, but must re-examine the Act, its history, and the implementing regulations and their history for statements that shed light on Congress's general intent regarding the role *binding* arbitration may play in disputes over *non-written* warranties.

The Act itself makes no explicit reference to binding arbitration. However, as noted in *Waverlee Homes*, the Act does contain a provision that evinces congressional intent to preserve a judicial forum for warranty disputes. This provision states in relevant part: "a consumer who is damaged by the failure of a supplier, warrantor or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief ... in any court of competent jurisdiction in any State or the District of Columbia; or ... in an appropriate district court of the United States...." 15 U.S.C.A. § 2310(d). On its face, this section applies to implied warranties. Thus, this court must determine whether its inclusion in the Act reflects Congress's desire to preclude warrantors and consumers from waiving their right to a judicial forum for resolution of implied-warranty claims.

Standing alone, subsection (d) of § 2310 cannot be said to evidence such a congressional purpose. Plainly, it does not even mention, let alone prohibit, binding arbitration as a dispute resolution procedure. Nor do any of its sister provisions in the Act suggest that subsection (d) was meant by Congress to abolish the option of pursuing binding arbitration rather than a federal district court lawsuit. Instead, this section merely establishes the jurisdiction of the district courts over such actions, thus providing a new, but non-exclusive, avenue for redress of implied warranty claims. The establishment of a federal forum for such claims simply supplements the jurisdiction Congress also granted state courts in subsection (d).

To be sure, § 2310 sets up alternative dispute resolution mechanisms or procedures, akin to arbitration, which consumers may be compelled to exhaust before resorting to a court lawsuit. This restriction on access to court, which, as explained in *Waverlee Homes*, the Federal Trade Commission has interpreted to be non-binding, is explicitly restricted to written warranties, though. Subsection (a)(3) of § 2310 provides that a warrantor may restrict a consumer from coming to court unless and until the consumer resorts to an "informal dispute settlement procedure" which meets three requirements. The first two requirements are that the warrantor "establish" a informal dispute settlement mechanism or procedure and that the mechanism or procedure "meet" the requirements of rules promulgated by the Federal Trade Commission. 15 U.S.C.A. § 2310(a)(3)(A) & (B). The third is that the warrantor "incorporates in a *written warranty* a requirement that the consumer resort to such procedure before pursuing any legal remedy ... respecting *such warranty.*" § 2310(a)(3)(C) (emphasis added). Thus, the court-access restriction applies not to all warranties, but to only "such warranties," that is, "written warranties."

No contrary congressional intent regarding binding arbitration of non-written or implied warranty claims may be discerned in the legislative history of the Act, nor in the implementing regulations or their history. As explained above, the only statements in these materials indicative of Congress's desire to limit or preclude binding arbitration were made in the context of written warranties, and these specifically relate to the ban on binding arbitration in the informal dispute settlement mechanisms or procedures prescribed in § 2310 of the Act. In fact, even with respect to written warranties, the Federal Trade Commission has made it clear that binding arbitration is a permissible option provided it is offered under certain limited circumstances. For instance, in response to comments expressing concern that the proposed implementing regulations forbade the use of binding arbitration after informal dispute settlement mechanisms or procedures had been exhausted, the Commission stated:

"[T]here is nothing in [the rule regarding informal dispute settlement mechanisms] which precludes the use of any other remedies by the parties following a Mechanism decision. The warrantor, the Mechanism,

or any other group can offer a binding arbitration option to consumers who are dissatisfied with Mechanism decisions or warrantor intentions. However, reference within the written warranty to any binding, non-judicial remedy is prohibited by the Rule and the Act."

40 Fed.Reg. 60168, 60211 (1975). The Commission also remarked that "in some cases the warrantor and the consumer might want to agree to use a remedy such as binding arbitration instead of proceeding to the Mechanism. Again, nothing in the Rule precludes the parties from agreeing to use some avenue of redress other than the Mechanism if they feel it is more appropriate." *Id.* Given these clear statements embracing the possibility of using binding arbitration to resolve claims arising from the Act, the court finds it untenable to conclude that the Magnuson–Moss Act reflects Congress's intent to prohibit the use of binding arbitration for the adjudication of implied and other non-written warranty claims. Instead, the examination of the Act and related materials undertaken here, when considered in light of the analysis in *Waverlee Homes*, convinces the court that it is exclusively in the context of written warranties, and then solely with respect to informal mechanisms of dispute resolution prescribed in § 2310(a) of the Act, that Congress sought to limit recourse to binding arbitration.[11]

The conclusion reached here, that Congress did not intend in the Magnuson–Moss Act to override the FAA's general mandate and preclude binding arbitration of non-written and implied warranty claims, is consistent with several decisions of the United States Supreme Court addressing the arbitrability of claims arising under other congressional statutes. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 23, 111 S.Ct. 1647, 1650–51, 114 L.Ed.2d 26 (1991) (claims arising under the Age Discrimination in Employment Act (ADEA), 29 U.S.C.A. §§ 621–634, held arbitrable); *Rodriguez de Quijas v. Shearson/American Ex-*

*press, Inc.*, 490 U.S. 477, 480–483, 109 S.Ct. 1917, 1919–21, 104 L.Ed.2d 526 (1989) (claims arising under § 12(2) of the Securities Act of 1933, 15 U.S.C.A. § 77l(2), held arbitrable); *McMahon*, 482 U.S. at 238–242, 107 S.Ct. at 2343–46 (claims arising under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b), and civil claims arising under the Racketeer Influenced and Corrupt Organizations Act (civil RICO), 18 U.S.C.A. §§ 1961–1968, held arbitrable); *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth*, 473 U.S. 614, 629, 105 S.Ct. 3346, 3355, 87 L.Ed.2d 444 (1985) (claims arising under the Sherman Act, 15 U.S.C.A. §§ 1–7, held arbitrable). In each of these decisions, despite the presence in the statute at issue of a jurisdictional provision analogous to § 2310(d) of the Magnuson–Moss Act, the Court ruled that the FAA's mandate had not been overridden by Congress.[12] Moreover, in both *Rodriguez de Quijas* and *McMahon*, even the presence in the statutes of a provision that explicitly voided agreements to waive any statutory provisions did not prompt the Court to find that binding arbitration was prohibited. *See Rodriguez de Quijas*, 490 U.S. at 482–83, 109 S.Ct. at 1920–21; *McMahon*, 482 U.S. at 227–28, 107 S.Ct. at 2338–39. Instead, in both decisions the court emphasized that an agreement to arbitrate does not constitute a waiver of any substantive statutory rights, but rather reflects a decision to seek adjudication in an alternative forum. *See Rodriguez de Quijas*, 490 U.S. at 480, 109 S.Ct. at 1920; *McMahon*, 482 U.S. at 229–30, 107 S.Ct. at 2339.

Additionally, the Supreme Court has remarked that provisions in these statutes that grant concurrent state and federal jurisdiction for statutory claims, as does § 2310(d) of the Magnuson–Moss Act, are consistent with permitting binding arbitration of such claims: "arbitration agreements, 'like the provision for concurrent jurisdiction, serve to advance the objective of allowing [claimants] a broader right to select the forum for resolving

---

**11.** As explained more fully below, this disparate treatment of written and non-written warranties, with the increased regulatory bite placed on the former, is consistent with Congress's overall aim in the Act to protect consumers from unfair written warranties.

**12.** These jurisdictional provisions are: ADEA, 29 U.S.C.A. § 626(c)(1); Securities Act of 1933, 15 U.S.C.A. § 77v(a); Securities Exchange Act of 1934, 15 U.S.C.A. § 78aa; civil RICO, 18 U.S.C.A. §§ 1964 & 1965; and Sherman Act, 15 U.S.C.A. § 4.

disputes, whether it be judicial or otherwise.'" *Gilmer,* 500 U.S. at 29, 111 S.Ct. at 1654 (quoting *Rodriguez de Quijas,* 490 U.S. at 483, 109 S.Ct. at 1921).

The Supreme Court reached its decisions in these cases despite vigorous challenges to the appropriateness of binding arbitration as a forum for vindicating the important statutory rights at stake. Challengers voiced concerns about the objectivity of arbitration panels, their disinclination to issue written opinions, their competence to handle factually and legally complex claims, their power to award appropriate legal and equitable relief, and the adequacy of their procedural mechanisms. Each of these arguments was rejected by the Court, which repeatedly emphasized the fundamental rationale for its decisions, as first articulated in *Mitsubishi:*

> "[C]oncern for statutorily protected classes provides no reason to color the lens through which the arbitration clause is read. By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum. It trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration."

473 U.S. at 629, 105 S.Ct. at 3354.

One challenge to the propriety of binding arbitration, raised with respect to the ADEA in *Gilmer,* bears closer examination here. In *Gilmer,* the former employee whose age discrimination claims under the ADEA were found to be arbitrable argued that due to the "unequal bargaining power" that existed between employees and employers, arbitration clauses in the employment context should not be enforceable in the face of the ADEA's employee-protective provisions. 500 U.S. at 32–33, 111 S.Ct. at 1655–56. The Court disagreed, stressing that the FAA's purpose was to place arbitration clauses on the same footing as other contractual agreements, and that claims of unequal bargaining power can be resolved on a case-by-case basis by courts, which "'should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds "for the revocation of any contract."'" *Id.* (quoting *Mitsubishi,* 473 U.S. at 627, 105 S.Ct. at 3354).

These observations enjoy equal validity here. However, the challenge based upon inequality of economic power is a potentially potent one in the context of the Magnuson–Moss Act, given that its legislative history provides a clear indication that the disparity of bargaining power between consumers and warrantors was in the front of Congress's mind when it enacted the legislation. For instance, the report accompanying the Senate version of legislation stated:

> "For many years warranties have confused and misled the American consumer. A warranty is a complicated legal document whose full essence lies buried in myriads of reported legal decisions and in complicated State codes of commercial law. The consumer's understanding of what a warranty on a particular product means to him frequently does not coincide with the legal meaning.... Typically, a consumer today cannot bargain with consumer product manufacturers or suppliers to obtain a warranty or to adjust the terms of a warranty voluntarily offered. Since almost all consumer products sold today are typically done so with a contract of adhesion, there is no bargaining over contractual terms."

S. Rep. 93–151, 93d Cong., 1st Sess., quoted in 40 Fed.Reg. 60168 (1975). The House report accompanying the bill echoes these concerns and demonstrates that Congress sought to prevent warrantors from employing sleight of word in their written warranties to limit or eliminate state law implied warranty protections. That report noted "the developing awareness that the paper with the filigree border bearing the bold caption 'Warranty' or 'Guarantee' was often of no greater worth than the paper it was printed on. Indeed, in many cases where a warranty or guarantee was ostensibly given the old saying applied 'The bold print giveth and the fine print taketh away.'" H.R. Rep. 93–1107, 93d Cong., 2d Sess., reprinted in 1974 U.S.C.C.A.N. 7702, 7706.

Consideration of these proclamations regarding Congress's objectives, in light of the Act's provisions themselves, reveals that congressional concern with the disparate economic strength of consumers and warrantors was focused exclusively on written warran-

ties. Thus, the bulk of the Act is devoted to establishing minimum disclosure and content standards for written warranties, and the form that informal dispute resolution mechanisms specifically mentioned in such warranties may take. *See* 15 U.S.C.A. §§ 2302 (contents of written warranties), 2303 (designation of written warranties as full or limited), 2304 (federal minimum standards for written warranties), and 2310 (informal dispute settlement procedures for written warranties). Thus, motivated by its recognition that written warranties were often associated with contracts of adhesion entered into by parties with unequal bargaining power, Congress's overall purpose in creating the Act was to protect consumers by prescribing new, detailed standards for written warranties that supplemented existing state law.

By contrast, Congress's intentions regarding non-written and implied warranties were far less ambitious. Rather than significantly revamp or supplement the treatment of implied warranties under existing state law, Congress opted to maintain the status quo. Thus, the Act explicitly defines implied warranties by reference to state law. *See* 15 U.S.C.A. § 2301(7).[13] Congress simply refrained from translating its concerns about unequal bargaining power into actual provisions governing non-written and implied warranties in the Act, unlike its treatment of written warranties.[14]

This difference in treatment between written and non-written warranties stems from the fact that implied warranties, as the Magnuson–Moss Act recognizes, arise under state law for the most part. These warranties, unlike the written warranties that are the primary focus of the Act, therefore are not the product of bargaining between powerful

manufacturers and relatively weak consumers. Instead, they derive from the legislative and judicial processes. Because these processes are not directly susceptible to the unequal-bargaining concerns addressed in the Act, Congress's decision to refrain from providing additional protection for implied warranties in the Act makes sense.

But perhaps the most telling evidence that Congress intended to limit its court-access restriction to written warranties is the fact, as shown above, that the informal dispute settlement mechanisms or procedures are limited to written warranties. If Congress had intended to include non-written warranties within the court-access restriction, it would logically have included non-written warranties within the informal dispute settlement mechanisms as well. Indeed, if the court were to conclude that non-written warranties are not subject to binding arbitration, then claims based on these warranties would, essentially, not be subject to any alternative dispute process, for, unlike written warranties, they would also not be subject to the non-binding informal dispute settlement mechanisms set forth in subsection (a)(3) of § 2310. Neither the language of the Magnuson–Moss Act nor its history supports such a distinctive and unusual treatment of non-written warranties.

Consequently, the court concludes that it is only with respect to written warranties that Congress sought in the Magnuson–Moss Act to protect consumers from exploitation by more powerful manufacturers and suppliers who desired to impose the requirement that disputes be resolved by binding arbitration. Congress chose not to do so with respect to manufacturers and suppliers subject only to non-written and implied warranties.[15]

---

**13.** Additionally, in keeping with Congress's primary focus on written warranties, the major provisions of the Act concerning implied warranties address them in relation to written warranties. *See* 15 U.S.C.A. § 2308 (restrictions on disclaimers, modifications, or limitations of implied warranties made in written warranties).

**14.** Additionally, the court notes that Congress was explicit about its intention not to include express, non-written warranties within the rubric of the Act's provisions. As the Court of Appeals for the D.C. Circuit has recognized, Congress ultimately decided not to specifically regulate

such warranties until they become "more prevalent." *See Walsh v. Ford Motor Co.,* 807 F.2d 1000, 1015 and n. 84 (D.C.Cir.1986) (quoting S. Conf. Rep. No. 1408, 93d Cong., 2d Sess. 26 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7702, 7758).

**15.** The court recognizes that purchase contracts like those at issue here also may constitute contracts of adhesion between parties with widely disparate bargaining power. However, the court's analysis of the Act and related materials establishes that the Act was not meant to function as a protective shield for consumers under

In view of the foregoing analysis, the court finds that the Foster plaintiffs cannot meet their burden of showing a clear congressional intent to override the FAA's general mandate in the Magnuson–Moss Act, as required by *McMahon*. Although Congress did intend to preclude *binding* arbitration in the context of *written* warranties under certain circumstances, it stopped short of doing so with respect to implied, *non-written* warranties. Consequently, the Foster plaintiffs' breach of warranty claims against the Hart defendants may be arbitrated pursuant to the FAA, provided that the arbitration clause is valid and enforceable under traditional contract law principles. In the next section of this opinion, the court will take up this last issue.

ii.

In their final challenge to the arbitrability of their claims against the Hart defendants, the Foster plaintiffs contend that the arbitration clause in their purchase contract is void and unenforceable because it was secured by fraud. Essentially, the Foster plaintiffs argue that they only learned of the existence of the arbitration clause when the home was delivered, over a full month after the agreement to purchase the mobile home was reached and they had paid a $1000 deposit to the Hart defendants.

■■■■ The Foster plaintiffs are correct to point out that pursuant to the FAA, general contract principles such as fraud, duress or unconscionability may be employed to invalidate agreements to arbitrate. *See Allied–Bruce Terminix*, 513 U.S. at 281, 115 S.Ct. at 843 ("[9 U.S.C.A. § 2] gives states a method for protecting consumers against unfair pressure to agree to a contract with an unwanted arbitration provision. States may regulate contracts, including arbitration clauses, under general contract principles and they may invalidate an arbitration clause 'upon such grounds as exist at law or in equity for the revocation of any contract.'"). Because the Foster plaintiffs' allegations of fraudulent procurement are exclusively directed to the arbitration clause, and not to the purchase contract as a whole, this court

may resolve the issue. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967); *Rainbow Inv., Inc. v. Super 8 Motels, Inc.*, 973 F.Supp. 1387, 1388–90 (M.D.Ala.1997). Of course, "the court must be presented with evidentiary facts that tend to show the existence of grounds at law or in equity to support the revocation of the arbitration agreement." *Id.* at 1389–90; *see Southside Internists Group v. Janus Capital Corp.*, 741 F.Supp. 1536, 1538 (N.D.Ala.1990) ("plaintiffs are not entitled to a jury trial unless their factual allegations raise a genuine issue as to the making of the agreement for arbitration") (citing *T & R Enter., Inc. v. Continental Grain Co.*, 613 F.2d 1272, 1275 (5th Cir.1980)).

■■■ The record indicates that the Foster plaintiffs cannot satisfy this burden. Even when cast in the light most favorable to the plaintiffs, the evidence does not permit the court to conclude that the Foster plaintiffs were fraudulently induced to assent to the arbitration clause in their purchase contract. While the court agrees with the Foster plaintiffs' assertion that the agreement to purchase the mobile home was made when Daniel Foster paid the $1000 deposit to the Hart defendants, it finds that this was an agreement to purchase the home subject to specific terms to be decided upon at delivery. These terms were finalized when Speaks assented to them upon actually signing the purchase contract. Hence, the terms of the executed purchase contract, including the arbitration clause, govern the sale of the Foster plaintiffs' mobile home. *See Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1149–50 (7th Cir.1997) ("payment preceding the revelation of full terms is common.... [A] vendor may propose that a contract of sale be formed, not in the store (or over the phone) with the payment of money or a general 'send me the product,' but after the customer has had a chance to inspect both the item and the terms.")

■■■ Having disposed of this threshold issue of contract formation, the court has no

such circumstances. By congressional design, unless a purchase contract includes a written warranty, only those safeguards erected by state

warranty laws operate to protect consumers against the sharp practices of manufacturers and suppliers.

difficulty reaching the conclusion that the Foster plaintiffs have failed to raise a genuine issue regarding the fraudulent procurement of the arbitration clause. Under the applicable Alabama law,[16] a finding of fraud requires the establishment of the following elements: (1) a misrepresentation or suppression of a material fact; (2) made willfully to deceive, or recklessly without knowledge; (3) which was justifiably relied upon by the plaintiff under the circumstances; and (4) which caused damage as a proximate consequence. *See Harris v. M & S Toyota, Inc.,* 575 So.2d 74, 76 (Ala.1991); *Curtis v. Bill Byrd Automotive, Inc.,* 579 So.2d 590, 593–94 (Ala.1990).

The Foster plaintiffs have not alleged facts sufficient to support a finding of fraudulent procurement under either the misrepresentation or suppression theories. Plainly, the Foster plaintiffs' purchase contract contains the entire arbitration clause governing the contract, and the parties do not dispute that Speaks actually signed the document. There is no allegation that the Hart defendants made any misrepresentations regarding the existence or nature of the arbitration clause in the purchase contract. Nor are there any allegations that the Hart defendants concealed or suppressed the clause when the contract was provided to Speaks for execution.[17] The court finds nothing in the record to cause it to suspect that Speaks was not given ample opportunity to review the document before she signed it. Nor is there any reason to conclude that Speaks was not free to refuse to sign the agreement if she disagreed with the arbitration clause's provisions, or that the Hart defendants downplayed or disguised its true import to induce her to sign. In sum, because the Foster plaintiffs proffer no evidence to suggest that the Hart defendants acted fraudulently regarding the arbitration clause, they do not raise the genuine issue required to put this issue before a jury. Accordingly, the court holds that the arbitration agreement between the Hart defendants and the Foster plaintiffs was not procured by fraud, and therefore may be enforced by the Hart defendants to compel arbitration of the breach of warranty and tort claims raised against it in the Foster plaintiffs' complaint.[18]

**16.** In *Foremost Ins. Co. v. Parham,* 693 So.2d 409, 421 (Ala.1997), the Alabama Supreme Court overruled its prior case law concerning the standard of reliance required for a finding of fraud, abandoning the then-current "justifiable reliance" standard in favor of one of "reasonable reliance." Because the *Foremost* court explicitly stated that this change would only be applied prospectively to all cases filed after March 14, 1997, and the instant cases were filed prior to that date, the "justifiable reliance" standard is applicable here. However, as explained below, the court need not reach the reliance issue because it finds that there is no evidence to suggest that the Hart defendants made any misrepresentations, or suppressed material facts, to induce Speaks to sign the purchase contract.

**17.** The Foster plaintiffs seek to convince the court that the fraudulent concealment occurred when the $1000 deposit was paid, at which time the Hart defendants said nothing about the existence of an arbitration clause in the purchase contract that they would require the Foster plaintiffs to sign upon delivery of the mobile home. However, the court has concluded that the agreement at that time was to purchase the home subject to specific terms to be agreed upon later, and those terms, including the complete and legible arbitration provision, were contained in the purchase contract that Speaks signed. Thus, absent any misconduct on the part of the Hart defendants—and none is alleged—when Speaks actually executed the purchase contract, there was no suppression of the agreement to arbitrate.

Additionally, the court rejects any assertion by the Foster plaintiffs that the Hart defendants were obliged, pursuant to state law or any other authority, to specifically highlight the presence of the arbitration clause within the purchase contract when it was signed by Speaks. Singling out arbitration clauses, as opposed to all provisions of a contract in general, for such special treatment is impermissible under the FAA. *See Doctor's Assocs., Inc. v. Casarotto,* —— U.S. ——, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) (FAA preempts state statute mandating that a contract subject to an arbitration clause satisfy specific requirements, including that notice of the arbitration clause be located on the first page of the contract and typed in underlined capital letters).

**18.** In a last ditch effort to avoid this result, the Fosters argue that they should not be bound by the terms of the arbitration clause because they never signed the purchase contract in which it appears. This argument may be disposed of quickly on either of the alternative grounds that the contracting parties intended to bestow third-party benefits upon the Fosters, or that Speaks acted as the Fosters' agent in executing the purchase contract for their benefit.

iii.

 Section 3 of the FAA calls for the court to stay the proceedings in an action pending the completion of arbitration of all arbitrable issues. 9 U.S.C.A. § 3. Where, as here, all of the issues raised in a complaint must be submitted to arbitration, courts have held that dismissal of the action is appropriate. *See Alford v. Dean Witter Reynolds, Inc.,* 975 F.2d 1161, 1164 (5th Cir.1992) (and cases cited therein). This court agrees. Dismissal better serves the interests of judicial economy under these circumstances, as the Fifth Circuit has explained:

> "Given our ruling that all issues raised in this action are arbitrable, retaining jurisdiction and staying the action will serve no purpose. Any post-arbitration remedies sought by the parties will not entail renewed consideration and adjudication of the merits of the controversy but would be circumscribed to a judicial review of the arbitrator's award in the limited manner prescribed by law. *See* 9 U.S.C sections 9–12."

*Id.* (quoting *Sea–Land Serv., Inc. v. Sea–Land of P.R., Inc.,* 636 F.Supp. 750, 757 (D.P.R.1986)). Therefore, the court will dismiss the Foster plaintiffs' complaint with prejudice, and compel them to submit their claims against the Hart defendants to binding arbitration pursuant to the arbitration clause in the purchase contract.

## III. CONCLUSION

Because the court concludes that defendant Homes of Legend may not, under any legal or equitable theory, invoke the arbitration clauses in the three purchase contracts at issue here to compel the plaintiffs to submit their breach-of-warranty, tort, and Magnuson–Moss Act claims to arbitration, the court will deny Homes of Legend's motions to dismiss or to stay and compel arbitration. However, because the court has determined that the arbitration clauses are valid and enforceable in light of both the Magnuson–Moss Act and traditional contract law principles, the Hart defendants' motion to dismiss will be granted, and the Foster plaintiffs will be compelled to submit their claims to binding arbitration as set forth in their purchase contract.

Accordingly, it is ORDERED as follows:

(1) Defendant Homes of Legend's motions to dismiss, or, in the alternative, motions to compel arbitration and stay proceedings, filed in all three cases on February 24 and March 7, 1997, are denied.

(2) The motion to dismiss and to compel arbitration, filed by the defendants Hart's Mobile Home Sales, Inc., Jimmy Hart and Judy Hart in state court prior to removal, is granted to the extent that plaintiffs Daniel R. and Sharon Foster, and Myrtle Speaks are ENJOINED and RESTRAINED from failing forthwith to arbitrate their claims against defendants Hart's Mobile Home Sales, Inc., Jimmy Hart and Judy Hart.

(3) The motion to dismiss and to compel arbitration, filed by the defendants Hart's Mobile Home Sales, Inc., Jimmy Hart and Judy Hart in state court prior to removal, is further granted to the extent that said defendants are dismissed.